And Mr. Rolfing. May it please the court, Lawrence Rolfing on behalf of Albert Sarkiss. Ordinarily when the court reviews a social security determination we ask the question whether the decision and the factual findings fall within the boundaries of is this a possible outcome that's reasonable, that a reasonable person would accept. That's the sentence four inquiry. But on the sentence six inquiry, when there's new and material evidence that's been presented to the federal court for the first time that the agency has not yet had a chance to review, this court's cases state that the question becomes is it possible that the agency would change their mind on remand. And that's been the law since Wainwright was decided almost 30 years ago and it's still the law of the circuit. No in-bank court has reversed it. And so when we look at the last bit of evidence that's in this record, Mr. Sarkiss on a subsequent application after this case was pending in federal court, refiled and alleged a disability of May 1, 2007, consistent with his prior presentation. And the state agency determined that the established onset date was July 24, 2010, one day after the ALJ decision. And the state agency explains it in the paper submitted in opposition by the government. The explanation of why the established onset date is different than the alleged onset date is because it's the day after the ALJ decision. Now it's clear from the record that Mr. Sarkiss got worse between 2007 and 2012. But the question is whether he was traveling down from the Tohon Pass into the Grapevine dropping 3,000 feet in 10 miles or whether he's dropping 3,000 feet to sea level driving from Nebraska to Louisiana. A gradual decline that is almost imperceptible. And that's the facts of the case that we have here. The state agency did not gratuitously give away two years of onset to Mr. Sarkiss because he's a nice guy. They did it because the evidence actually supported the onset date and jurisdictionally the state agency could only roll back to the day after the ALJ decision that was then pending in federal court. What is the new evidence that is material in your view that would bring us to sentence six? Yes. There are a couple of pieces of evidence that are very important in that, Your Honor. One is the finding of Dr. Veera Vathama that was done in 2012. And in that case, on that motor examination, the consultative examiner on the subsequent application found motor strength of 4-5, 2-5, and 3-5. And 15 pounds of grip force in the right hand. Some of those findings are better and many of them are worse than the findings of Dr. Mays in 2010 where Dr. Mays finds trace motor strength in the triceps, the ability to push down or push away, 1-plus on the left, 3-5 wrist extension. Okay. You don't need to go through that much detail. So it's Dr. Vathama's opinion that's the new evidence that in your view would support sentence six. Is there any other category or piece of evidence that in your view is new and significant after the date of the decision? Yes. Dr. Amos' findings on examination in July of 2012. Anybody else? And the opinions of Dr. Vaghawala, which is the state agency physician in 2012 that signed off on the July 24, 2010 onset date. Okay. So three doctors reports. Correct. Yes. Yes. Three doctors. Okay. Yes. And the reason why that evidence in 2012 reflects back in time is because it is thoroughly consistent with the opinions of Dr. Junjua in 2009, Dr. Slater and Dr. That causes me to wonder whether it is really new. If it's the same as what the agency already considered, I wonder whether that qualifies as really new and whether it can backdate. In other words, if you examine someone in 2012 and they're at a certain level of disability or condition, ability, whatever it is, but you didn't examine them in 2010 or 2009, how is that useful? Or how does that fit the category of material evidence? It's clearly new. It might be cumulative, but it's new. Right. Okay. Well, does cumulative count in this context? If there are two doctors that say X and one that says Y and the agency says, well, we believe Y, but we already thought about X, and you just come in and say more X, how does that justify a remand? Well, it justifies a remand because we're traveling in this context in subtle shades of gray. And Dr. Vargahuala, Dr. Amos, and Dr. Varnatha are giving opinions that are slightly different. It confirms what Dr. Mays said in 2010, that Mr. Sarkis has a progressive condition, and it's giving the data points showing that he is on a downward slide. And so when we trace that line... But that's a given in this case. I mean, isn't it that he was on a downward slide? I don't think anyone has questioned that that was the general trajectory, which is why there is a later disability finding. But as you say, the issue is, you know, where do you cross that threshold? And it's hard for me to see how evidence two years later can demonstrate that the threshold was crossed five years earlier. Two years earlier. Or two years earlier. Yes. Well, that is the opinion of Dr. Vargahuala and the opinion of the state agency in finding disability. They, in the exercise of agency discretion, said that this evidence in 2012 casts a shadow back in time. The state agency decided that the evidence cast that long of a shadow. And there isn't... The only inference from the clear statement of why the established onset date, the EOD, differed from the alleged onset date, the AOD, is the jurisdictional barrier of the ALJ decision. And the ALJ, for instance, denigrated the finding of no grip strength in the right hand by Dr. Mays. It was confirmed by a very poor grip strength in the right hand by the treating primary care physician. Three letters in Reyes. I forgot his name. He thought that that was inconsistent. But the state agency, when they get the further data points down the line and they're able to draw that line, says, no. Are you thinking of Dr. Ghebreyes? Yes. Ghebreyes. Yes. Thank you, Your Honor. Because when we just have two or three data points, we don't have the cluster of data that we get once we put the 2012 data points into the picture. And the 2012 data points inform the agency that there is, in fact, significant reason why to believe and to legally find that the onset date at least abutted the ALJ decision, if not invaded it. But the agency could not make that finding. Let me ask a question. The magistrate judge found in the order that a remand was not warranted because the SSA's subsequent decision awarding benefits was based on a changing condition and was not material to the instant case. They were dealing with two sort of situations, which I'm having trouble understanding how they relate one to another, such that remand is warranted. So I'm asking it sort of in a different way. Under this circuit's jurisprudence in Chavez v. Bowen, 1988, and the acquiescence ruling, this circuit, the Sixth Circuit and the Fourth Circuit, have this continuing presumption of non-disability. And so the claimant has the obligation to overcome that continuing presumption. The agency applies that continuing presumption. So the only way that the agency could find disability at all is to find a change in circumstances. And so in the Bruton case, for instance, there's a finding of change of age category, change of evidence, change in time period. And the state agency in this case found that the additional data points provided the basis upon which to find disability. Otherwise, they would be bound by the ALJ's prior assessment. All right. I'd also like to address Mr. Sarkis's subjective complaints of pain. Some of which were discredited by the administrative law judge. Correct. And so the question is whether those reasons amount to clear and convincing reasons. And so the best evidence that Mr. Sarkis is not as impaired as he claimed he was is the opinions of Dr. Mays in the record at 301. Dr. Mays found trace strength in the tricep, decreased wrist extension strength, decreased finger abduction strength. No discernible grip strength in the right hand. And the ALJ, for instance, said that no discernible grip strength in the right hand. Well, that must have been fame. But Dr. Mays is not a physician that is unfamiliar with the disability process. She conducts these consultative examinations at the request of the state agency. And if she thought that it was famed, she would have said so. And for the ALJ to speculate against medical opinion is contrary to the law of the circuit. I will reserve the remaining three minutes of my time. You may do that. Thank you. We'll hear from the government. Good morning, Your Honors. Elizabeth Fehr for the Acting Commissioner of Social Security, Carolyn Colvin. Regarding the second application for benefits, there is a lot of evidence in the record that the claimant's condition deteriorated. And the most important is that the claimant himself said that the changes occurred around February 2012. That's on the first page or the second page of Dr. Vaguala's state agency review of the second application. And several times within that report, Dr. Vaguala says that the condition has changed. And if you compare the evidence that was before our ALJ and the evidence in that second application, it does show a clear deterioration in the condition. You do have strength findings that are arguably similar throughout. But during the time that the ALJ reviewed, the claimant was independent in his daily activities. No doctor said he needed a cane to move. The only doctor who mentioned atrophy was Dr. Mays, and she said that claimant had noticed atrophy in one of his legs. By the time you get to the second application, both Drs. Amos and Dr. Veeravasana noted significant atrophy. Both of them noted the claimant needed to use a cane. And the claimant reported that by that time his daughter had moved in with him and was taking care of his activities that he had previously done himself. So that's clear deterioration. And what Luna and Bruton stand for in this court is whether or not the two applications can be reconciled on the evidence that is before the court. Here, it is clearly reconcilable. The agency already performed that function. And the fact that Dr. Vaguala decided to set the onset date back as far as he could does not impugn what our ALJ did and what the evidence before him showed. Counsel Judge Gould, if I could interject a question. On the issue whether the decisions can be reconciled, what is the standard of review under which we're supposed to look at the agency's decision that they can be reconciled, that it got worse and so on? I believe that standard would be what's set forth in Brews and Taylor. If the evidence that comes into the record after the ALJ's decision would have a reasonable possibility of affecting what the ALJ did. And here when you look at that evidence, you can see that it does show a clear deterioration, not the least of which is claimant's admission that his condition deteriorated. We do know this is a progressive condition, but if you look at the evidence that's before our ALJ and the evidence that he relied on, his findings are reasonable. Okay, thank you. So if the court doesn't have any further questions, we say that the applications are reconcilable. The ALJ's decision in this case is supported by substantial evidence, not the least of which is Dr. Mays and Dr. Bugg. The ALJ properly rejected the treating physician and properly found that claimant was not fully credible. What reasons did the ALJ give for the lack of credibility to a certain extent on the extent of disability that you believe are supported by the record? Well, I believe the two most important things are the facts that, despite claiming that he really had no use of his hands, claimant was doing several activities that do involve use of the hands, driving, playing cards, smoking cigarettes, doing household activities, using the computer. And that's all in his testimony around pages 71 and 72. And then the fact that he admitted he was looking for an office job, which is what the ALJ found he could perform. Those are the two most important things. The ALJ also noted gaps in treatment that belied claimant's allegations of severely debilitating conditions. We know he has a condition that affects his ability to work. And for a young man, the RFC is rather limiting. And significantly, he admitted he was looking for the kind of work that the ALJ found he could do. Weren't there some indications that even though doctors had suggested that he be on medications, there were periods when he wasn't on medication, which would suggest that the pain wasn't as severe as he had represented it to be? That is definitely true, Your Honor. Yes. Are there any further questions? Nope. No questions here. Thank you. Thank you. We ask that you affirm the district court. Thank you. Mr. Rolfing, you have some time remaining. Thank you, Your Honor. I'd like to address the last question first. This hereditary neuropathic pressure palsy, there's no cure. There's nothing he can take to restore his strength. There's nothing he can take to restore his ability to withstand pressure. There's no medication except pain medication. And his complaints aren't that he has pain. His complaints are that he has dysfunction, and the medication and treatment that's available doesn't address the dysfunction. And he isn't obligated to either become hospitalized, give up life. But that wasn't the only reason for disbelieving him. I think that counsel also correctly pointed out that there was a discussion by the ALJ. It was on a different page of the decision, but about his daily activities, including things that required the use of both hands in a significant way. Well, one of them is reading a book. Well, there's use of a computer. There's doing his laundry. There's, you know, all kinds of other activities that are listed that require the use of both hands and arms, cleaning, shopping, playing cards, and driving, so forth and so on. All of those things he admitted to and all of those things Dr. Janjua assumed in the expression of her opinions that he was limited to less than sedentary work, and none of those activities require any type of sustained exertion, whether sitting, standing, or walking, or using his hands. It's not sustained. The proposition that you must always have your both hands at 10 and 2 to drive, I might get arrested on the way back to my office today if I don't. The fact that the proposition that you can only play cards with two hands, well, I've played cards in Vegas and they slap you down if you touch the cards with both hands. They don't want you to touch your cards with both hands. And that's why in the immigration context, this court has long held that the ALJ or the IJ in that context has an obligation when they perceive a conflict in the record between the testimony and other evidence to ask the claimant for an explanation and to consider that explanation. But the ALJ... So far that's not a requirement in this context. So far, and I would urge, and we did in our brief, we urge the court to adopt that rule because otherwise we say, well, you drove your car. How do you drive your car with one hand? It's a very simple question to ask. Well, I get it. It's an automatic. I drive with my left hand. I park and I shift in and out of park and reverse and drive by leaning over with my left hand. If that was the testimony, then that would explain how a person could drive with his right hand. In addition, Mr. Sarkis doesn't have... He has wrist strength and finger strength problems, but that doesn't mean he can't hang his hand on the steering wheel as a counterbalance. So to not require an explanation and to make a decision based on substantial speculation, it just really... It counsels in favor of adopting the Soto-Olarte rule in this court. Thank you. Thank you. The case just started to be submitted, and once again we very much appreciate the helpful arguments of counsel.
judges: Graber, Gould, Daniel